Call the next case. 109-2089, Linda Reaven. Counsel, please. Good morning, Justices. Mr. Cassano, may it please the Court, Peter Lekas on behalf of the Appellant. Keep your voice up, please. Linda Reaven. Your Honors, I know this is a very voluminous record. There's a lot of doctors, a lot of hospitals, a lot of therapists. And sometimes when you have a record this large, things get a little confusing. There's really one critical issue in this case, and the critical issue relates to Section 8A of the Act. Whether or not the Appellant, Linda Reaven in this case, exceeded her two-choice limitation pursuant to Section 8A. Arbitrator Black concluded that when Ms. Reaven went to Methodist Hospital on March 22, 1995, that that was her first choice of physicians. I would argue to this Court that that finding is contrary to the facts and evidence in this case and against the manifest weight of the evidence. What did she say that she did as far as Methodist Hospital? What she testified to, Your Honor, was that she was in a trade show in Houston, Texas for a week. She was driving a co-worker back to the airport on March 19, 1995. She was rear-ended by a Chevy Suburban. And she sought emergency room treatment at 12 Oaks Hospital in Houston, Texas on the day of the accident, March 19, 1995. She then testified that she continued to notice increased symptoms over a period of a couple days. She was still in Houston at this trade show. And she testified that she noticed increased pain in her arm, burning sensations, nausea, stiffness, swelling in the arm and the neck area. So she, three days after the accident, on March 22, 1995, went to the emergency room at Methodist Hospital. She was examined in the emergency room. She was given medication and told it was okay for her to return home. She testified that she went there on March 22, 1995, because her condition was worsening. She didn't seek out Methodist Hospital, Your Honor. She didn't? I'm sorry? She didn't seek it out? Well, she testified that that was the nearest hospital to her hotel room in Houston, Texas. Did she say she went there because she wanted to get another opinion? She testified to that? Well, in cross-examination, after rigorous cross-examination. It's better to require a yes or a no. She said that she did. She did on cross-examination, Your Honor. Don't you think in presenting the facts, you've got to tell us that? Well, she did, but if you take all the facts into account, the increased symptoms, the fact that she's in Houston, Texas, she's over 1,000 miles away from Chicago. Her family is in Chicago. Her friends are in Chicago. Her treating physician, Dr. Benditson, is in Chicago. Was it unreasonable for her to go to the emergency room on a second occasion, three days after the accident? I don't think it was. I think it was an emergency, and it should fall under Section 8A, which covers first aid and emergency room treatment. It doesn't appear the arbitrator was too impressed. Was the arbitrator impressed with the claimant? Your Honor, the arbitrator was not impressed with the claimant's testimony. Was there any reason not to be? Well, I think it related to other factors in the case. There was a previous incident she had with previous employers. There was an incident they talked about where she was in Mexico and fell off a horse in a car accident. But I don't believe credibility goes to the facts of the first four days after this incident occurred. Why not? Because, like I said earlier, Your Honor, was it unreasonable for her to go to an emergency room, being due to the fact that she was in Houston, Texas? I don't think that was unreasonable. I don't know what credibility has to do with that. Now, if arbitrator Black thinks she was trying to build up a case three days after an accident occurred in March 1995, I just don't feel there's evidence to support that. There's one thing that's curious. I mean, I think it's implicit in here that he felt that she was trying to exaggerate her symptoms. She testifies that when one of the emergency responders at the scene gets there, he says, this one didn't make it, referring to her. And yet, according to all the other witnesses, she climbs out of the car on her own, she refuses an ambulance and medical treatment, and doesn't need any assistance. So how do you reconcile her testimony about that? Your Honor, in response, the only thing I can tell you is this is an accident that happened in 1995. I believe this case proceeded to trial in 2006, approximately 11 years after the fact. You know, obviously, a lot of things happened in her life since the date of the accident up through the date of the hearing. I would agree with you that it's not what occurred, according to Officer LaSalle, who was on the scene. But that's what she testified to. To this day, she says this. I don't want to belabor it or blow it out of proportion. I'm simply pointing out that I don't know that I would agree that her credibility is irrelevant to any issue in the case, because I think the credibility... Well, I didn't say that, Judge. I think it's irrelevant when it comes to the issue of why she went to Methodist Hospital on March 22, 1995. Had she been in Chicago, and had she gone, had an accident in Chicago, went to Northwestern Memorial Hospital, and three days later went back and went to a different hospital, I would agree with the employer that that was a choice. But that's not the case here. This girl is over 1,000 miles away from Chicago. She can't call her primary physician. She can't go see Dr. Bennetson, who works out of Northwestern Memorial Hospital. How does that help her from your standpoint? Well, it helps her, Your Honor, because the employer in this case cites the Wolf case. So she made the decision to want to go to another doctor. Well, it wasn't another doctor, Your Honor. It was an emergency room. I think there's a difference between going to another doctor and going to the nearest emergency room in the area. She testified that the only reason she went to Methodist Hospital, it was the closest hospital to her hotel room. It wasn't like she called and got a referral to go there or was told this is a great hospital to go to. She went there because it was nearest to her hotel. It's emergency room treatment under the facts of this case. Like I say, had this happened in Chicago, I would agree that would be a choice. But due to the fact she's out of town in an unknown area, experiencing pain. Do you think the arbitrator looked at what she testified to as to going from doctor to doctor to doctor when she was back in Chicago? Well, Your Honor, I don't know if it was necessarily going back to doctor to doctor. These doctors were all referred. I agree there's a lot of treatment in this case. But these are all excellent doctors she went to. She went to all, basically almost every doctor at Northwestern Memorial Hospital. She was at the pain clinic. She saw Dr. Mark Bowen. She saw Dr. Levy. Dr. Levy testified that she had a chronic condition. It necessitated ongoing care. Dr. Press testified that she had a chronic condition and she would need therapy endlessly for her right shoulder. I think it's unfair to hold that against her that she went to a lot of doctors. Yes, she went to more doctors than the normal claimant does. But everybody's pain tolerance is different. Everybody feels different. And everybody is different in terms of how aggressive they are in terms of medical treatment. So I don't know what that has to do with the issue of going to Methodist Hospital on March 22, 1990. The argument she went to Methodist, it was emergency room treatment, I think, has some superficial appeal, so to speak. But isn't there a more subtle issue involved here? And that is, isn't the determination of whether the medical provider is the first choice, isn't that a question of fact for the commission? It's a question of fact, Your Honor, but at the same time, it has to hold up to the burden of manifest way to the evidence. And I think based on the facts of this case. Why is an apposite inclusion clearly apparent, then? Because it was emergency room treatment, Your Honor. It was four days after the accident. What if the commission chose to believe the story she told on a cross-examination, that she went to Methodist Hospital for a second opinion because she was dissatisfied with the services that she had received at the other hospital. And disbelieved what she said on direct. I understand that. They can assume that. But I think if you take all the facts into account, an opposite inclusion is apparent. Just due to the circumstances, the time frame, the logistics, where she was at, and the circumstances of the case. She's a young woman. She's out of town. She's by herself. She had no way of going to her primary doctor or going to a doctor in Chicago. It would be unreasonable for her to get on a flight, go back to Chicago, go to the emergency room, and then hop back on a flight and go back to Houston, Texas. It's unusual in that you've got two emergency room visits within four days. But I don't think it's unusual under the circumstances of this case. If you get around that issue and you conclude that that was not her first choice, then I took painstaking time in this case, when I tried this case, to show that all of the doctors she saw in Chicago were through a chain of referral. Either through Dr. Levy or Dr. Benenson, her primary doctor. Yes, there's maybe 15, 20 doctors that she saw, but they all were through a chain of referral, specifically through Dr. Levy. And the reason that's critical in this case, Your Honors, is that there was approximately $88,000 in medical bills that was denied based on the finding of her exceeding her two-choice limitations. It also affects her ability to seek treatment in the future. She has treating doctors telling her she needs ongoing treatment the rest of her life. Based on this finding, she's on her own. Her employer is not responsible. That's not a basis to reverse the commission. No, it's not, Your Honor. The question becomes, is it against the manifest way of the evidence? Right, I understand. So that's the crucial issue in this case. With respect to permanent disability, I know this Court generally defers to the commission. I would argue that the permanency award is inadequate under the circumstances she's had extensive treatment. She's had four procedures to her right shoulder, two closed manipulations, an open manipulation, and an actual arthroscopic surgery by Dr. Bowen. She had surgery on her left shoulder by Dr. Romeo. There's no award for any permanency with respect to the left shoulder. If I look at your brief correctly, maybe I'm wrong. You only make one issue in your brief on appeal. And that's the oath for the choice of physician. That's correct, Your Honor. Is that correct? In detail, yes, Your Honor. Okay. I don't see how you think you can argue these other issues when you didn't make them an issue on appeal. Okay. Well, with respect to causation, Your Honor, the employer ---- You didn't even make in your brief an issue concerning that. Well, Your Honor, I think I do refer to it as an issue in the case. When you read your issue in your brief, it deals only with the choice of physician. Your Honor, I did mention the permanency award. If you look specifically at page 14 and 15, I did make a brief argument that I thought the permanency award was inadequate. But you cite no cases. No, I do not. Issues where no cases are cited are forfeit. So we've got two issues here where there isn't a single case cited. Finally, with respect to causation, if I could just briefly address that. The employer filed a cross appeal in this case, arguing that the left shoulder was not related and that finding was against the manifest weight of the evidence. I would point to the testimony of Dr. Robert Levy. He took his deposition. He testified that the condition in the left shoulder was causally related. That opinion was adopted by Arbitrator Black. It was affirmed by the Industrial Commission, affirmed by the circuit court. Even Arbitrator Black, in his decision with respect to causation, says he credits the opinion of Dr. Press, Dr. Romero, excuse me, Dr. Press, Dr. Levy, and Dr. Cordes. So I would ask that you affirm that aspect of the decision. And I would ask you to reverse the commission's finding with respect to the claim in exceeding your choice of limitations. Did you file a brief as a cross appellee? No, I did not. Is there any further questions? Thank you. Counsel, please. May it please the Court, good morning. Good morning, Mr. Lekas. I'm Larry Cassano. I represent the employer in this case, Putnam Publishing. It's our view, Your Honor, that the decision in the case is not against the manifest weight of the evidence and should be affirmed in all respects except for one very small one, and that is, as Mr. Lekas alluded in closing, the issue of the left shoulder and its causation or causal connection to the work accident in March of 1995. It's set out in my brief, but I want to highlight just a couple of points. The accident occurred in 1995, and there are no complaints in the record until five years later, as to the left shoulder, until five years later when she sees Dr. Press. And at that time, she gives a history that she had some sort of an altercation. She testified at trial. It was a run-in with an ex-boyfriend or something when she was pushed down and then experienced left shoulder pain. Her left shoulder pain complaints began then, did not predate that occasion in 2000. Can I ask a question? Did Dr. Levy testify that as early as May 1999, she complained of bilateral shoulder pain as a result of myofacial pain syndrome, and that the myofacial pain syndrome grew out of the accident? Did he testify to that? Forgive me. I don't know exactly what date he testified she began it. 1995-99 sounds about right, and he did testify to that. It's my view, though, Your Honor, that the manifest or greater weight of the evidence is contrary to that testimony and to that opinion, and that the greater weight of the evidence at trial is that the left shoulder is not causally related. The arbitrator made no award of permanency as to the left shoulder. And really, there's only one reference where he alludes to the causation of left shoulder, and that's in the sentence where he writes essentially that the shoulders are causally related. The injury to the shoulders are causally related or is causally related to the work accident in 1995. I don't know if that was a typographical error where an extra S was included. I don't know. However, to clarify the record, I think it's important that we correct that issue now. Why? What relief was granted for the left shoulder? There was none. Well, how can you appeal for no relief? Well, I'm appealing that decision because I suppose, Your Honor, Petitioner might come back later on some sort of a 19-H or an 8-H petition relating to treatment or the condition of that left shoulder. And we can battle about it then, I suppose. Well, see, if you're correct and we affirm the commission on her choice of physicians, what could she appeal for? What could she file a 19-H on? I guess all she could do is, and I'm just guessing, I guess what she would have to do is go back to one of the doctors in the chain of referral and see if she could get a referral to a doctor to treat that shoulder. So I don't really have anything to add other than that issue. And it's my position, as I said, that that one small issue is the only one that I raise and the only aspect of the decision I criticize. In all other respects, I would ask that the Court affirm the decision. Thank you. Any rebuttals? Your Honors, the only rebuttal I would have is there was symptoms and diagnosis as Honor points out, there was a diagnosis of myofascial pain syndrome, which is basically somebody who is exhibiting diffuse symptoms bilaterally in both shoulders, I think as early as Dr. Levy had testified. That's really the only testimony in the case with respect to the left shoulder that it was related. The respondent, the employer had my client examined by numerous independent medical examiners. I don't believe any of them gave an opinion with respect to the left shoulder. Thank you. The Court will take the matter under advisement for this position.